UNTE CHEH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cheh
Docket No. 27746-89
United States Tax Court
T.C. Memo 1992-658; 1992 Tax Ct. Memo LEXIS 699; 64 T.C.M. (CCH) 1291; November 10, 1992, Filed *699 Decision will be entered under Rule 155. For Petitioner: Ronald B. Rubin, Terry A. Bauman, and Richard C. Stark. For Respondent: Lindsey D. Stellwagen. PARKER
PARKER
MEMORANDUM OPINION PARKER, Judge: By statutory notice of deficiency dated October 13, 1989, respondent determined a deficiency in petitioner's Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
1986
$ 10,277
$ 513.85
50 percent of the
interest on the
deficiency
All section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the issues for decision are as follows: 1. Whether petitioner has established that he was carrying on a trade or business of translating Korean materials into English, and if so, whether he may deduct, on Schedule C, certain business expenses in 1986 for this purported business. We hold that petitioner was not engaged in a trade or business, and therefore, is not entitled to the business deductions and depreciation he has claimed relating thereto. *700 2. Whether petitioner may deduct, under section 217, certain expenses he allegedly incurred in moving from King of Prussia, Pennsylvania, to the Washington, D.C., area in connection with a change in place of employment. We hold that, in addition to the amount allowed by respondent, petitioner is entitled to a further deduction of $ 106.87. 3. Whether petitioner, under section 166, is entitled to a nonbusiness bad debt deduction for money he allegedly loaned to his former wife. We hold that he is not. 4. Whether petitioner may deduct, under section 170, certain contributions he allegedly made to charities. We hold that petitioner has not established that he is entitled to such deductions in any amount greater than that already allowed by respondent. 5. Whether petitioner may deduct, under section 165, alleged losses flowing from the theft of his car and its contents. We hold that he may not. 6. Whether petitioner may deduct employee business expenses attributable to his employment with the United States Nuclear Regulatory Commission, his translation services, and job-hunting efforts. We hold that he may deduct certain additional job-hunting expenses in the total amount *701 of $ 946. 7. Whether petitioner is liable for additions to tax for negligence pursuant to section 6653(a)(1)(A) and (B). We hold that he is so liable. Also, petitioner claimed various additional deductions in his petition that he had not claimed on his 1986 tax return. [2] We will discuss these additional deductions under the appropriate sections below. [3]
*702 For convenience, our findings of fact and opinion on each issue will be combined, but each issue will be discussed under a separate heading. General Background
Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed, petitioner Unte Cheh resided in Rockville, Maryland. Petitioner is a nuclear engineer employed full time by the United States Nuclear Regulatory Commission. He reported a substantial amount of income for the taxable year 1986, but claimed large deductions for Schedule C business losses, employee business expenses, job-hunting expenses, moving expenses, theft loss, and various other deductions, which resulted in a reported tax liability of zero for the year. Most of the issues are essentially factual, involving questions as to whether certain events actually occurred, whether certain expenses were actually incurred, and whether petitioner has substantiated the amounts of any deductible expenses. Schedule C Deductions
Petitioner claimed a business loss in the amount of $ 5,259.61 on Schedule C of his 1986 individual *703 Federal income tax return. Petitioner's claimed Schedule C loss deduction is based on translation services that he performed in his home for the United States Joint Publications Research Service (JPRS), a division of the Central Intelligence Agency (CIA). In the statutory notice of deficiency, respondent disallowed all of the loss claimed by petitioner on Schedule C. [4]
In his petition to this Court, petitioner claimed additional deductions of $ 1,494.41 for "Computer/word processor and peripheral accessories" and $ 1,036 for "Office maintenance/operation and depreciation". On brief, petitioner revised [5] his net loss claim as follows: Income
$ 212.80
Expenses
Travel    494.02 Magazines and Dues    240.00 Laundry and Cleaning    120.00 Home Office Expenses    [6] 212.80 Contract Labor    22.80 Printer (depreciation)    31.80 Telephone away from home    268.79 Prof. journals & books    520.00 Storage    1,177.81 Net Loss
($ 2,875.22)
*704 During the tax year at issue, petitioner was a nuclear engineer for the United States Nuclear Regulatory Commission (NRC) on a full-time basis. In 1985, petitioner asked JPRS about providing translation services on a part-time basis. JPRS engages independent contractors to translate foreign language materials into English. The translated material is usually *705 published in reports and made available to the various departments and agencies of the Federal government and to government contractors. Some of these materials are also made available to the public through the Department of Commerce. JPRS has approximately 700 translators throughout the United States. JPRS finds it more cost-effective to enter into contracts with part-time translators, who perform specific projects upon request and who need not move to Washington, D.C., to do so, rather than to hire full-time employees. These translators must perform their services in their own homes or other locations, because JPRS does not provide any office space or equipment for their use. JPRS does not promise these translators any specific volume of work, or indeed any work, because it has no control over the amount of work it receives. These translators receive no assurance that they will receive any assignments to translate materials. Petitioner signed an independent contractor agreement with JPRS, effective April 1, 1986, to translate into English Korean materials concerning nuclear mathematics. The agreement was to remain in effect until September 30, 1986, but would be automatically *706 renewed for successive 1-year periods unless terminated by the written notice of either party. By letter dated August 26, 1987, JPRS notified petitioner of its intention to terminate the agreement, effective September 10, 1987. The agreement was terminated at that time. Other than the translation services rendered to JPRS under the above contract, petitioner had never engaged in translation services before that time and has not engaged in any such activity since that contract. In December 1986, JPRS sent letters to its translators highly recommending that they consider performing their translation services on a computer. JPRS provided an incentive of $ 3 per 1,000 words in addition to the translator's regular rate per 1,000 words for work completed on a computer. The letter stated that there may also be tax benefits related to purchasing a computer. However, it would take even the most productive independent contractors, on average, a few years and the translation of several hundred thousand words to pay for a computer. Petitioner had already purchased a computer/word processor sometime before July of 1986, [7] and his purchase was not prompted by this JPRS letter. *707 During 1986, petitioner received a total of $ 212.80 for the translation services he performed for JPRS, receiving $ 16 on June 6, 1986; $ 29.60 on July 9, 1986; $ 57.20 on August 8, 1986; and $ 110 on September 5, 1986. Petitioner signed a Direct Deposit Form allowing JPRS to deposit such payments directly into petitioner's personal bank account. Because of his employment by NRC, petitioner was prohibited from performing translation services for anyone other than another department or agency of the United States Government. He had to obtain special permission from NRC to perform such services for JPRS. Only JPRS or other divisions of the CIA had need of such services to translate nuclear mathematics materials from Korean into English. Therefore, there was no private market or other government market in which petitioner could pursue such translation activities. Petitioner argues that he has established that he was in the trade or business of translating Korean technical materials into English for JPRS, and that he has substantiated his business expenses related thereto. Petitioner asserts that he was engaged in "carrying on" a trade or business by having entered into a contract *708 with JPRS to perform translation services and by holding himself out as available to perform such services for JPRS throughout 1986. Petitioner further contends that the translation of Korean nuclear mathematics materials into English has none of the earmarks of a hobby or other activity entered into for extraneous reasons. Petitioner claims he has presented sufficient evidence to document the business expenses he incurred with respect to his translation activities. He, therefore, contends that he is entitled to deductions on Schedule C as are allowable under sections 162, 167, and 168. Respondent contends that petitioner has not met his initial burden of proving that he was engaged in a bona fide trade or business. Furthermore, respondent asserts that the expenses claimed are not ordinary and necessary business expenses, but an attempt by petitioner to deduct personal expenditures. Before determining whether petitioner has incurred ordinary and necessary expenses and has properly substantiated them, we must first determine whether or not petitioner has established that he was carrying on a trade or business. The answer to this question must be based upon a factual consideration *709 of this case. Commissioner v. Groetzinger, 480 U.S. 23, 35-36 (1987). In order to demonstrate that he was engaged in a bona fide trade or business, petitioner must show that he had an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 643-644 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Petitioner bears the burden of proving he was engaged in the translation services for JPRS with the requisite objective of making a profit and that the deductions he claimed on Schedule C were properly taken. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Elliott v. Commissioner, 90 T.C. 960, 971 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990). Section 1.183-2(b), Income Tax Regs., provides nine factors to be used in evaluating whether or not the requisite profit objective exists. [8] No single factor is controlling; rather, all of the facts and circumstances of the case as a whole must be evaluated. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), *710 affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner, 72 T.C. 28, 34 (1979). We give more weight to objective facts than to a taxpayer's statements of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985); sec. 1.183-2, Income Tax Regs. Moreover, the absence of a particular element of profit objective may be more significant than the superficial presence of other factors. Beck v. Commissioner, 85 T.C. at 570. *711 In evaluating a taxpayer's profit objective, this Court primarily focuses on whether or not the taxpayer has undertaken extensive efforts or investments in the activity or has conducted the activity in a businesslike manner. [9] Often, when these factors are absent, we find that the taxpayer did not have the requisite profit objective. [10]
*712 Based on all of the facts and circumstances of this case, we conclude that petitioner's translation activities did not rise to the level of a trade or business. Petitioner had other, more compelling, objectives than profit in conducting the activity. He also did not conduct the activity in a businesslike manner. The translation services performed by petitioner were minimal and sporadic. In fact, petitioner's full-time employer restricted the types of business activities in which he could engage. Petitioner was not engaged in the translation activities with the actual and honest objective of making a profit. He did not undertake to construct any detailed or realistic plan of how much translation work would have to be performed before he would recoup his expenditures. Although he may have hoped to make some additional income from this activity, other objectives drove petitioner to seek to perform translation services for JPRS. During the trial, petitioner testified that he hoped to impress JPRS with his work, and hoped that this activity would lead to more involvement and job opportunities with the CIA. In a letter, dated January 24, 1987, addressed to JPRS, petitioner wrote *713 that "my work with the JPRS has not made any economic sense at all although I have enjoyed doing the work. * * * I did not intend to make any profit with the JPRS translation work to begin with, but I did not know that I would have to lose so much in time and cost. * * * I do not need the petty sum of money from the JPRS that much, but I would do it for fun." [11] Moreover, in a letter to respondent's appeals officer, dated February 12, 1989, petitioner again indicated that he derived pleasure and satisfaction from doing worthwhile work for the United States Government and that "I do not always work for money, but for dedication and pride, and various other reasons." [12] These letters indicate that the monetary rewards from translating materials for the JPRS were secondary to petitioner's desire to gain prestige and recognition and to make potential job connections. *714 We also considered petitioner's unbusinesslike manner of conducting the translation services and keeping records. Petitioner did not keep many receipts, nor did he log those that he did keep in any organized manner. In addition, petitioner has claimed deductions for personal expenses or nondeductible expenditures. [13] Even considering start-up costs in the first year, petitioner's claimed deductions were vastly disproportionate to any income he could receive from part-time translation work. A profit objective entails an intent to produce gross income in excess of related expenses. See Portland Golf Club v. Commissioner, 497 U.S. 154 (1990). Petitioner's excessive deductions were also largely unsubstantiated. Travel expenses were reconstructed in September of 1988 during audit from a calendar on which certain dates were merely circled in red with no explanatory notations. [14] Moreover, even the red circles were not made contemporaneously with the events. *715 Petitioner's translation activities were not continual or regular. He completed a minimal number of projects with little hope of receiving significantly more amounts of additional work in the future. In addition, we do not think that petitioner could have fully pursued this activity to the level of a trade or business because NRC, his full-time employer, restricted outside activity. During 1986, petitioner did not and could not advertise his services as a translator. Petitioner had to secure special permission from NRC to undertake the JPRS translation activities because the conflict of interest laws would normally prohibit part-time work with private industry in the nuclear field. Thus, petitioner knew that he could not engage in any private trade or business in the nuclear field while working full time for NRC. Therefore, we conclude that petitioner was not engaged in the translation services with the requisite profit objective and is not entitled to deduct his claimed business expenses or depreciation. Respondent's disallowance of petitioner's net Schedule C loss for 1986 is sustained. Moving Expenses
During 1986, petitioner's employer, NRC, transferred him to a new *716 post of duty. As a result of the transfer, petitioner moved from King of Prussia, Pennsylvania, to the Washington, D.C., area on June 13, 1986. In 1986, NRC reimbursed petitioner $ 10,594.97 for most of the moving expenses he incurred. This amount was included in petitioner's W-2 wage income. Usually, any reimbursement from an employer must be included in gross income. Sec. 82. On Form 3903 attached to his 1986 Federal income tax return, petitioner claimed total deductions for moving expenses in the amount of $ 14,968.25. He claimed $ 3,000 in deductions for: (1) pre-move travel, meals, and lodging to search for a new residence; (2) temporary living expenses in new location prior to moving to permanent quarters; and (3) qualified residence sale, purchase, or lease expenses. The amount of $ 3,000 is the statutory limit allowed under section 217(b)(3)(A) for such indirect moving expenses. Petitioner also claimed $ 11,968.25 in deductions for: (1) transportation of household and personal property; and (2) travel, meals, and lodging in moving from the old residence to the new area of employment. In the statutory notice of deficiency, respondent allowed the entire $ 3,000 deduction *717 for indirect moving expenses and $ 1,387.25 [15] of the $ 11,968.25 deduction for direct moving expenses. On brief, petitioner does not contest respondent's determination [16] but claims he is entitled to an additional $ 197.39 of direct moving expenses in addition to respondent's allowance. [17]
*718 Thus, the only issue unresolved with respect to moving expenses is whether petitioner has substantiated and is entitled to any or all of the claimed additional deduction of $ 197.39 for direct moving expenses. Petitioner bears the burden of proving his entitlement to any moving expense deduction in excess of the amount respondent has already allowed. Rule 142(a); Muse v. Commissioner, 76 T.C. 574, 577-578 (1981). Petitioner requests a $ 1,453.56 deduction for the amount paid to Allied Van Lines, Inc., for the transportation of petitioner's household and personal belongings. NRC paid Allied, on behalf of petitioner, $ 1,346.69 of this amount, and respondent has allowed petitioner a corresponding deduction. However, petitioner contends that the remaining $ 106.87 paid by petitioner should also be deductible as a direct moving expense under section 217. Petitioner has substantiated the full $ 1,453.56 by presenting the voucher for transportation costs prepared by the NRC, indicating which costs NRC would pay and the additional amounts for which petitioner would be responsible. Section 217(a) allows deductions for qualified residential moving expenses *719 paid or incurred by an employee or self-employed person. Reasonable direct moving expenses paid or incurred by the taxpayer are deductible without limitation. The regulations under section 217 state that: amounts are considered as being paid or incurred by an individual whether goods or services are furnished to the taxpayer directly (by an employer, a client, a customer, or similar person) or indirectly (paid to a third party on behalf of the taxpayer by an employer, a client, a customer, or similar person). * * * [Sec. 1.217-2(a)(1), Income Tax Regs.] Thus, the $ 1,346.69 paid by NRC and included in petitioner's income is deductible by petitioner and has been allowed by respondent. The remaining $ 106.87 not paid by NRC represents an insurance surcharge and an extra pickup charge. We hold that these expenses are reasonable ones within the definition of "moving household goods and personal effects" under section 217 and, thus, we will allow their deduction as well. Sec. 1.217-2(b)(3), Income Tax Regs.
Petitioner also requests additional deductions of $ 131.08 ($ 14.04, $ 3.80, and $ 113.24) for his travel by car from King of Prussia, Pennsylvania, to the Washington, D.C., *720 area and the additional direct expenses incurred in relation thereto. See supra note 17. Petitioner departed King of Prussia, Pennsylvania, on June 12, 1986, and arrived in Gaithersburg, Maryland, on June 13, 1986, after spending the night with friends in Pennsylvania. The $ 113.24 is comprised of (1) $ 75 for six meals, including lunch with friends in Collegeville, Pennsylvania; (2) $ 35.24 for mileage expenses (234.9 miles, including trips to Philadelphia and Collegeville, Pennsylvania, at $ .15 per mile); and (3) $ 3 for road toll charges. The taxpayer may deduct only those expenses reasonable under the circumstances of the particular move. The taxpayer must take the shortest and most direct route from the old to the new location in the shortest period of time commonly required. Sec. 1.217-2(b)(2)(i), Income Tax Regs. This regulation provides: Thus, if moving or travel arrangements are made to provide a circuitous route for scenic, stopover, or other similar reasons, additional expenses resulting therefrom are not deductible since they are not reasonable nor related to the commencement of work at the new principal place of work. In addition, expenses paid or incurred *721 for meals and lodging while traveling from the former residence to the new place of residence or to the general location of the new principal place of work and return or occupying temporary quarters in the general location of the new principal place of work are reasonable only if under the facts and circumstances involved such expenses are not lavish or extravagant. According to the evidence presented by petitioner, we find that the $ 113.24 in additional expenses represents a double counting of car and toll expenses as well as various meals petitioner had alone or shared with friends he visited along a "circuitous route" between his old and new residences. We note that petitioner is seeking to deduct $ 75 worth of meals, an inordinate amount for the relatively short trip from King of Prussia to the Washington, D.C., area. He also seeks to deduct extra mileage expenses for side trips to visit friends. Petitioner's employer, NRC, reimbursed petitioner $ 40.56 for car and food expenses, and respondent allowed a corresponding deduction. We, thus, find that respondent has already allowed petitioner to deduct the reasonable portion of these expenses. No further deduction is allowable *722 for the balance of $ 90.52 ($ 131.08 - $ 40.56 = $ 90.52). Thus, of the additional $ 197.39 deduction for moving expenses now sought by petitioner, only an additional $ 106.87 is allowable. Nonbusiness Bad Debt
Petitioner claimed nonbusiness bad debt losses in the amount of $ 3,000 on Schedule D of his 1986 Federal income tax return as a carryover from 1985. Petitioner claims that he made three loans of $ 5,000, $ 1,010, and $ 250 to his former wife and that she has refused to repay these loans. Respondent disallowed petitioner's claimed Schedule D nonbusiness bad debt deduction on the ground that petitioner never established that the loans were actually made or, if made, that the debt was worthless in 1985, when petitioner first claimed the loss. Respondent also found that petitioner did not substantiate these payments. On December 27, 1984, petitioner married Bernadette McCaffrey, an Irish national whom he had met while working in Saudi Arabia. Petitioner contends that, prior to the marriage, Ms. McCaffrey requested a loan [18] from him in the amount of $ 5,000 to be used to pay for certain items for the wedding and for her mortgage. Petitioner contends that he made *723 a second loan of $ 1,010 to his wife, in May 1985, to open a household checking account, and a third loan of $ 250 sometime thereafter. Petitioner asserts that, in 1985, after the dissolution of the marriage, [19] Ms. McCaffrey defrauded him by refusing to repay the funds loaned to her. The only evidence petitioner presented regarding the existence of the first loan was a letter written by Ms. McCaffrey requesting him to bring $ 5,000 to Ireland to pay certain wedding and other expenses. Petitioner also presented a canceled check, dated December 17, 1984, drawn to "cash", bearing *724 the notation "cash for a trip to Europe". This check was endorsed by Koram Travel Agency in Philadelphia, Pennsylvania. When these points were brought to petitioner's attention on cross-examination, he stated that there had been an error and, if given enough time, he could "come up with the real check -- cancelled check." The Court is satisfied that this is "the real check". The second loan was in the amount of $ 1,010, made in May 1985. Petitioner presented a canceled check drawn to Bernadette McCaffrey-Cheh and endorsed by her, with the notation "to open a checking account". Petitioner testified that he lent this amount to his wife to open a household checking account. However, petitioner contends he retained possession of this check, but, when his former wife left, she knew its location, took the check, and cashed it. With respect to the third loan, petitioner testified that he kept cash in his chest of drawers for his use, apart from money he made available to his wife for household purposes. He claims that his former wife took $ 250 from his drawer and that this money should be characterized as a loan to her. Respondent asserts that petitioner has failed to establish *725 that he is entitled to a nonbusiness bad debt loss. Respondent contends that petitioner did not present any evidence of a debtor-creditor relationship between himself and his former wife. Respondent contends that the evidence petitioner presented at trial shows that the amounts claimed were not loans, but were used to pay for the couple's wedding, for his trip to Europe, and for family household purposes. Even if the payments were to be characterized as loans, respondent points out that petitioner did not show that the debts were worthless in 1985 when he first claimed the loss or in 1986 when he carried over the $ 3,000. Finally, respondent asserts that petitioner has failed to substantiate the $ 5,000 or the $ 250 payments. Deductions are strictly a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to the deductions he claims. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111 (1933). Section 166 allows a deduction for any bad debt which becomes worthless during the taxable year. However, section 166 distinguishes business *726 bad debts from nonbusiness bad debts. Sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Nonbusiness bad debts may be deducted in the same manner as short-term capital losses only if they are entirely worthless in the year claimed. Sec. 166(d). Only a bona fide debt qualifies for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs. This regulation defines a bona fide debt as one that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Gifts and contributions to capital are not considered to be debts for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs.
Section 1.166-5(b), Income Tax Regs., defines a nonbusiness debt as follows: (b) Nonbusiness debt defined. For purposes of section 166 and this section, a nonbusiness debt is any debt other than -- (1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. *727 The question whether a debt is a nonbusiness debt is a question of fact in each particular case. * * * In determining whether a debtor-creditor relationship represented by a bona fide debt exists, this Court takes a facts-and-circumstances approach and examines the substantive nature of the relationship on a case-by-case basis. Fisher v. Commissioner, 54 T.C. 905, 909 (1970). The basic test in making such a determination is whether the debtor is under an unconditional obligation to repay the creditor, and whether the creditor intends to enforce repayment of the obligation. Sec. 1.166-1(c), Income Tax Regs.; Fisher v. Commissioner, 54 T.C. at 909-910. We strictly scrutinize advances between family members. Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), affg. T.C. Memo. 1975-319. [20] Furthermore, transfers between husbands and wives are presumed to be gifts. Bartos v. Commissioner, 27 T.C. 1002, 1005 (1957); Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per *728 curiam 192 F.2d 391 (2d Cir. 1951). Clear evidence is required to prove that spouses intended at the time the advances were made that they would be repaid. The gift presumption "may be rebutted by an affirmative showing that there existed at the time of the transaction a real expectation of repayment and intent to enforce the collection of the indebtedness". Estate of Van Anda v. Commissioner, 12 T.C. at 1162. [21]
Petitioner has not rebutted the presumption that these amounts represented gifts of money or customary *729 marital expenditures. More importantly, petitioner has not established the existence of a debtor-creditor relationship between himself and his former wife. Although petitioner contends there was an oral agreement that he would finance their expenses, no loan agreements or other records were ever executed between the parties. Petitioner has not presented any evidence indicating that either party intended, at the time of the expenditures, that the amounts petitioner paid for the wedding, for Ms. McCaffrey's mortgage, and made available for household expenses would be repaid by Ms. McCaffrey. In fact, Ms. McCaffrey's letter strongly indicates that her understanding at the time was that petitioner would simply pay these expenses. The notations on the checks presented as evidence do not indicate the existence of any indebtedness. See supra note 21. We conclude that it was only after the painful dissolution of this marriage that petitioner began seeking to recoup this money. We cannot allow him to do so through a nonbusiness bad debt deduction. Petitioner has failed to establish the existence of any such debt, and we hold that respondent properly disallowed petitioner's 1986 *730 Schedule D nonbusiness bad debt deduction. Charitable Contributions
Petitioner claimed $ 6,280.61 in cash charitable contributions on Schedule A of his 1986 Federal income tax return. Petitioner now concedes that he made an error and that most of his claimed charitable contributions were made in property, not cash. In the statutory notice of deficiency, respondent disallowed $ 3,957.61 (rounded up to $ 3,958) of petitioner's claimed charitable contribution deductions. Respondent allowed petitioner's monetary donations to his church made by check, certain other cash donations, and certain noncash donations, but disallowed portions of the deductions claimed for both cash and donated property. The disputed amounts (in rounded figures) are as follows: Item
Claimed
Allowed
Disallowed
Cash
$ 779  $ 679  [22] $ 100  Cash Donations to
Charities  (without checks  or receipts)  1,000
-0-
1,000
Goodwill (noncash)
554
137
417
Salvation Army (noncash)
5/13/86  990
187
803
6/13/86  481
59
422
11/07/86 2,477
941
1,536
Philadelphia Fire
Victims (noncash)  [23] 755
320
435
Totals:
$ 7,036
$ 2,323
$ 4,713
*731 Petitioner contends that he kept accurate records of his donations to qualified charitable entities. Petitioner asserts that he has met his burden of proof by presenting these records and by testifying to the cash contributed, the items contributed, and estimations of the items' fair market values. Thus, petitioner concludes that he is entitled to all of his disallowed charitable deductions. Respondent first asserts that petitioner has not presented any evidence, documentary or otherwise, of the approximately $ 1,000 in cash donations that petitioner allegedly made to charities. Respondent points out that petitioner merely testified that he regularly made donations to his church, sometimes in cash and sometimes by check, with no further substantiation. Section 170(a) provides a deduction for any charitable contributions, as defined in subsection (c), to qualified entities made within the taxable year. However, section 1.170A-13(a), Income Tax Regs., provides that: If a taxpayer makes a charitable contribution of money * * *, the taxpayer shall maintain for each contribution one of the following: (i) A cancelled check. (ii) A receipt from the donee charitable organization *732 * * *. (iii) In the absence of a cancelled check or receipt from the donee charitable organization, other reliable written records showing the name of the donee, the date of the contribution, and the amount of the contribution. Petitioner has not complied with the documentary substantiation requirements of the regulations with regard to certain cash donations. Petitioner has offered no evidence of having made these contributions besides his unpersuasive, self-serving testimony. Thus, petitioner has not met his burden of proof regarding this item. We sustain respondent's disallowance of the $ 100 and the $ 1,000 deductions. With respect to the donated property, respondent does not dispute that some donations were made, but does not agree with petitioner's valuation of the donated property. Respondent asserts that petitioner failed to present documents or testimony that would substantiate the determination of the fair market value of the donated property claimed on his return. If property other than money is donated, "the amount of the contribution is the fair market value of the property at the time of the contribution * * *". Sec. 1.170A-1(c)(1), Income Tax Regs. Under *733 section 1.170A-1(c)(2), Income Tax Regs., fair market value is defined as: the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. * * * The determination of the fair market value of donated property is a factual inquiry. Estate of DeBie v. Commissioner, 56 T.C. 876, 894 (1971). Petitioner bears the burden of proving both the fact that the contributions were made and the fair market value of the contributed property. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Petitioner has presented receipts from Goodwill and the Salvation Army demonstrating that donations of clothing and household items were in fact made. But, it is the practice of such charitable organizations to merely acknowledge receipt of a donation and not to comment on the value a donor has placed on his donation. [24] Although petitioner at some point did list *734 and value each item separately, he did not indicate the basis upon which he determined these values. In fact, during his testimony, petitioner at times confused his own valuation notations with those of respondent's auditor.
Thus, we have only the conflicting and unexplained valuations presented by petitioner and respondent. We must independently determine the appropriate valuations and corresponding deductions to be accorded the donated property. [25] However, we have no evidence to support valuations in excess of those determined by respondent. On this record, we find the fair market values of the donated property to be no more than those determined by respondent. Indeed, considering the large numbers of items allegedly donated and the unreliability of petitioner's evidence, the Court thinks that respondent has been rather generous in her allowances. Thus, petitioner is entitled to deductions only in those amounts already *735 allowed by respondent. Casualty/Theft Loss
Petitioner reported a casualty loss of $ 21,381.98 on Form 4684 of his 1986 Federal income tax return, attributable to the alleged theft from his automobile of personal property that allegedly had been packed in his car in anticipation of his move to the Washington, D.C., area. [26]
*736 In the statutory notice of deficiency, respondent disallowed this deduction in full. Respondent disputes that a theft of personal property from the car ever occurred. According to petitioner's testimony, he was originally scheduled to move to the Washington, D.C., area on June 9, 1986. [27] In preparation for the move, petitioner stated that he packed his car with personal items on the night of June 8, 1986. In the early morning of June 9, 1986, about 4:00 a.m., petitioner's car was stolen from the parking lot of his apartment building. The police had staked out that parking lot because of a rash of car thefts there, and observed the thief driving the car out of the lot. The police recovered the car within minutes after the theft and apprehended the thief. The thief did not have any personal property in his possession when apprehended; the police officer who immediately examined petitioner's car did not observe any personal property in the front or back seat of petitioner's car. The car trunk had not been tampered with, so the police did not break into the trunk to see if it contained any property. *737 The police report of the incident does not mention the theft of any items from the vehicle. By his own admission and the testimony of the police officer on the scene, petitioner never told the police that there was any personal property in the car. Officer Richard Hiller, the policeman who recovered petitioner's car and apprehended the thief, inspected petitioner's car immediately upon its recovery and saw nothing in it. During his testimony, Officer Hiller further explained that, if anything had been in the car, it would have been noted on the tow slip; anything of extreme value would have been taken into custody by the police. Nothing of this nature was noted on the tow slip or taken into police custody. After towing, petitioner's car was inventoried for personal property, but none was found. The car's trunk was not searched because there was no evidence of damage or tampering. After being notified about the recovery of his car, about 4:15 a.m., petitioner later that day went to the police impound lot to see his car, but he did not inspect the inside of the car nor discuss with any police officers whether any personal property had been recovered. Petitioner merely observed *738 the car from a distance, and petitioner then left for Washington, D.C., on June 12, 1986. He did not actually see the inside of the car or the trunk of the car until 9 days after the auto theft, on or about June 18, 1986, when he returned to the Philadelphia area on another matter. However, early in the day on June 9, 1986, petitioner reported the alleged theft of the car's contents to his automobile insurer and stated the contents' worth to be about $ 503. Petitioner's automobile insurance policy covered all but $ 50 (the deductible) of the damage to the car, but did not cover any personal property. Section 165(a) permits taxpayers to deduct losses sustained during the taxable year that were not compensated for by insurance. Section 165(b) governs the amount of the deduction. Losses incurred by individual taxpayers are subject to additional rules under section 165(c). Under section 165(c)(3) and (h), an individual can deduct a theft loss if the amount of such loss exceeds $ 100. Petitioner bears the burden of proving his entitlement to a section 165 theft loss deduction. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In order to *739 carry this burden, petitioner must establish both the existence of a theft and the amount of the loss. Rule 142(a); [28]Elliott v. Commissioner, 40 T.C. 304, 311 (1963). Petitioner has not carried his burden of proof in this case, and therefore, we must deny the section 165 theft loss deduction petitioner has claimed. *740 We find petitioner's claims of property stolen from his car and his entire testimony regarding this alleged theft loss incredible and unworthy of belief. We simply do not believe petitioner's testimony. [29] Petitioner offered only vague and incredible testimony as to his failure to notify the police of the alleged theft of over $ 20,000 worth of personal property. He reported only a few items worth $ 503 to his insurance company, but not the Kruggerands, jewelry, television, and VCR that he claims were also in the car. More importantly, he did not even ask the police about the personal property allegedly in his car, yet he made a claim on the insurance company before he knew or could have known whether or not a theft loss had occurred. The Court is satisfied that the theft loss is a phony claim without any basis in fact. *741 Furthermore, even if we were to believe that a theft of personal property had occurred, petitioner could not even list, with reasonable certainty, the alleged contents of the car. Petitioner testified that he prepared the list of stolen items attached to his return at least 6 months after the theft. In constructing this list, petitioner stated that, if an item were not listed on the bill of lading used for his move, he assumed it must have been in the car. Upon a review of the bill of lading, we are hard pressed to see how anyone could determine, with any specificity, the contents of the cartons being moved and the items that might be missing. The bill of lading simply listed numbers of barrels and cartons without any indication of their contents. Petitioner cannot satisfy his burden of proof by making assumptions or by presenting self-serving opinions. Tank v. Commissioner, 29 T.C. 677, 684-685 (1958), revd. 270 F.2d 477 (6th Cir. 1959). [30] Petitioner's unsupported assertions as to the theft and the amount of the loss do not satisfy his burden of proof, and therefore, we sustain respondent's disallowance of the theft *742 loss deduction.
Employee Business Expenses
Petitioner claimed a deduction for employee business expenses in the amount of $ 16,650.81 on Form 2106 of his 1986 Federal income tax return, all of which respondent disallowed in the statutory notice of deficiency. On brief, petitioner now asserts that he is entitled to a total deduction in the amount of $ 14,126.05, attributable to business expenses incurred in connection with his employment with NRC, his translation services, and job-hunting efforts. Petitioner contends that he used his car 95 percent of the time for all of his business-related activities and arrives at a figure of $ 5,864.19 for automobile expenses. [31] Petitioner asserts he is entitled to deduct $ 2,462.86 for travel expenses related to his job search, his translation services, or both. [32] Petitioner also claims a deduction for copying and mailing resumes and application forms in the total amount of $ 4,560 *743 ($ 3,648 for Federal jobs and $ 912 for positions with private corporations and universities). Lastly, petitioner contends he incurred $ 1,200 of telephone charges by contacting prospective employers and $ 39 for pamphlets listing Federal job opportunities. *744 1. Automobile Expenses
Petitioner initially testified that he purchased his car in 1984 exclusively for NRC inspection trips. However, petitioner then testified that the United States Government provided him with a car for inspection trips, that sometimes he rented a car for this purpose, or that he sometimes rode with other employees during such trips. The NRC normally reimbursed petitioner for his inspection travel expenses, including his mileage. Petitioner also stated that, in 1986, he began to use his car for trips relating to his translation services for JPRS and to his job-hunting efforts. Petitioner contends he used his car 95 percent of the time for all of these purported business purposes and, therefore, should be allowed to deduct 95 percent of his direct automobile expenses. Respondent contends that petitioner's claimed automobile expenses relating to NRC work are not ordinary and necessary, were not required by petitioner's employer, and, in most cases, were fully reimbursed. With respect to car expenses relating to job hunting and to translation services, respondent asserts that petitioner has double deducted both actual auto expenses and indirect auto *745 expenses (mileage) on Form 2106 itself as well as on Form 3903 and Schedule C. Overall, respondent points out that petitioner has not properly substantiated the expenses nor distinguished the various purposes for which he used his car. Thus, respondent wholly disallowed the $ 5,864.19 of automobile expenses that petitioner deducted. We sustain respondent's disallowance. No portion of petitioner's direct automobile expenses are deductible. First, petitioner has not proven that he used his personal automobile for NRC business purposes. Petitioner did not need this car for NRC work because NRC made a car available for this use. If petitioner did use his own car for inspection trips, he was fully reimbursed by NRC or would have been reimbursed had he submitted a claim to NRC. Reimbursable travel expenses are not deductible. Stolk v. Commissioner, 40 T.C. 345 (1963), affd. per curiam 326 F.2d 760 (2d Cir. 1964); Podems v. Commissioner, 24 T.C. 21 (1955); see also sec. 1.274-5(e)(2)(i), Income Tax Regs. Second, as we have previously discussed, expenses related to the translation services are *746 not deductible. And last, petitioner has attempted to deduct both direct and indirect automobile expenses (mileage) for job-search trips. Since petitioner has not made any effort to indicate what percentage of the car's use corresponds with trips related to job hunting, no direct automobile expense deduction will be granted. Also, there is no indication as to what percentage of the mileage related to job hunting, so we cannot allow any deduction on that basis either. 2. Away from Home Travel Expenses
We now consider the $ 2,462.86 for travel expenses related to job-search trips, JPRS-related trips, or both. Section 274(d) provides strict substantiation rules with which a taxpayer must comply in order for a travel expense deduction to be allowed. Sec. 1.274-5, Income Tax Regs. At the time of travel, petitioner did not maintain adequate travel records as mandated by section 274(d) and the regulations. Petitioner created travel records years later during audit. Petitioner testified that he prepared the travel log "based on my best recollection", using a "bunch of receipts" and a 1986 calendar on which, during February 1987, he had merely circled in red the dates when *747 he traveled in 1986, with no further notations as to the purpose of the trip or expenses related thereto. [33] Mere testimony concerning his trips for various purposes without corroborative evidence is not sufficient to meet the requirements of section 274(d). Sec. 1.274-5(c)(1), Income Tax Regs.[34] Thus, we sustain respondent's disallowance of these travel expenses. *748 However, petitioner has made a sufficient evidentiary showing of a job-hunting trip to Alabama. He presented a credit card bill for hotel expenses ($ 44.28) and a canceled check payable to a travel agency for airfare ($ 572), and he testified that he had interviews with representatives of the Marshall Space Center and the Cold Star Company. [35] Therefore, petitioner is entitled to a deduction in the amount of $ 616.28. 3. Other Job-Hunting Expenses
With respect to other expenses *749 related to petitioner's job-hunting activities, section 162 allows taxpayers to deduct all the ordinary and necessary expenses they have paid or incurred during the taxable year in carrying on any trade or business. Such a deduction includes expenses incurred in searching for new employment in the employee's same trade or business. Cremona v. Commissioner, 58 T.C. 219 (1972); Primuth v. Commissioner, 54 T.C. 374 (1970); see also Rev. Rul. 75-120, 1975-1 C.B. 55, clarified by Rev. Rul. 77-16, 1977-1 C.B. 37. Respondent contends that petitioner has failed to establish that the claimed job-seeking expenses were ordinary and necessary and has further failed to substantiate any of these claimed expenses. Petitioner bears the burden of proving that he, in fact, incurred the claimed expenses, that the expenses were of a business nature rather than personal, and that said expenses were ordinary and necessary. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Chapman v. Commissioner, 48 T.C. 358 (1967). *750 "Whether an expenditure is directly related to a business and whether it is ordinary and necessary are doubtless pure questions of fact in most instances." Commissioner v. Heininger, 320 U.S. 467, 475 (1943). We are convinced that petitioner is not entitled to deduct most of the job-search expenses he has claimed. Petitioner's records and his testimony are too unclear and ambiguous to support the deductions. From the records that have been presented, it appears that petitioner has claimed duplicate deductions for the same item and deductions for items that are nondeductible personal expenses. Secs. 162, 262. Petitioner merely created two versions of expense records (one for Friday and one for Saturday) for job hunting and for translation services, photocopied them, and filled in various dates for the Fridays and Saturdays between October 10 and December 20, 1986. These records are not consistent with reality and are not reliable. We can accord these documents no probative weight. The parties have stipulated that petitioner did send applications to various entities in his job searches. Petitioner has presented canceled checks payable to the *751 postmaster in the amount of $ 79.72 for postage stamps, and therefore, he is entitled to a deduction in that amount. Petitioner has provided no receipts to substantiate the other expenses he claims to have incurred with regard to job hunting. From the record, we are unable to determine if such expenses were actually incurred and, if so, the actual amounts expended. Particularly troubling is the lack of receipts or some form of substantiation for the enormous expenses claimed for photocopying and telephone charges. Also, some of these expenses were incurred in connection with his rental properties, and we cannot determine whether such expenses have already been claimed and allowed on Schedule E. The record is insufficient for the purpose of allowing us to estimate with any certainty the amount of deductions to which petitioner would be entitled.[36] However, some amount was no doubt expended for photocopying in connection with job searches and for telephone calls in those job searches. Using our best judgment but bearing heavily against petitioner whose inexactitude is of his own making, we conclude that petitioner is entitled to deductions of $ 200 for photocopying and $ 50 for *752 telephone calls. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Petitioner claimed $ 4,560 for photocopying *753 and mailing, $ 1,200 for telephone charges, and $ 39 for pamphlets. We sustain respondent's disallowance of $ 4,280.28 ($ 4,560 less deductions of $ 79.72 for postage stamps and $ 200 for photocopying) for the photocopying and mailing of resumes. We sustain respondent's disallowance of $ 1,150 ($ 1,200 less $ 50) for telephone charges, and $ 39 for pamphlets. Negligence Addition
Respondent has determined that petitioner is liable for additions to tax under section 6653(a)(1)(A) and (B). Section 6653(a)(1) provides that, if any part of an underpayment of income tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to the sum of (A) 5 percent of the underpayment, and (B) an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The Commissioner's determination is presumptively correct and will *754 be upheld unless the taxpayer is able to rebut this presumption by proving that the underpayment was not due to negligence or intentional disregard of rules and regulations. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioner asserts that he has put forth his best effort in preparing an accurate Federal income tax return. He states he attempted to analyze complicated provisions of the law himself and made numerous attempts to obtain the advice and assistance of the Internal Revenue Service. Respondent counters that petitioner did not behave in a reasonable and prudent manner by taking deductions to which he was not entitled, by deducting certain items more than once on the return, by deducting personal expenses, and by deducting fictitious losses. Respondent contends that petitioner failed to keep adequate contemporaneous records to support his claimed deductions and losses. It was only during audit, years later, that petitioner prepared logs and summaries of his alleged expenditures to offer as substantiation for the deductions and losses that he had *755 claimed on his 1986 tax return. Therefore, respondent concludes that the underpayment in this case is due to negligence and the intentional disregard of rules and regulations. We agree. The facts demonstrate that petitioner was indeed negligent. As we have made clear throughout this opinion, deductions are a matter of legislative grace, and petitioner bears the burden of proving that he is entitled to all of the deductions claimed on his return. Deputy v. du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). On his 1986 Federal income tax return, petitioner double deducted a number of expenses, attempted to deduct personal expenditures, greatly inflated or falsified claims, and failed to provide sufficient documentation to substantiate his claims. We are satisfied that the entire underpayment of tax is attributable to negligence. We, therefore, sustain respondent's determination of additions to tax. To reflect the foregoing holdings, Decision will be entered under Rule 155. Footnotes
1. At trial and on brief, petitioner conceded that he had made errors in preparing his tax return and that he had not met his burden of proof with respect to a number of items and, thus, was not entitled to certain deductions he had claimed on his 1986 Federal income tax return. These concessions will be discussed in the appropriate sections of this opinion.↩
2. In his petition to this Court, petitioner claimed the following additional deductions: Attorney's fees - $ 750 Office maintenance/operation and depreciation - $ 1,036 Contribution to Philadelphia Fire Victims - $ 755 ($ 320 of this amount has already been allowed by respondent.) Casualty loss on sterling silver set - $ 6,348 Computer/word processor & peripheral accessories - $ 1,494.41 ↩
3. A deduction for attorney's fees expended to reinstate petitioner's security clearance was first raised in the petition. Petitioner did not introduce any evidence at trial concerning these fees nor did he specifically address this issue on brief. Thus, petitioner has failed to meet his burden of proof regarding this matter, or has conceded that he is not entitled to this additional deduction. Rule 149; Cerone v. Commissioner, 87 T.C. 1, 2↩ n.1 (1986).
4. Respondent disallowed the net loss claimed, and thus allowed deductions up to the amount of gross income, $ 212.80, derived from the activity, under sec. 183(b)(2).↩
5. By this revision, petitioner eliminated some of the more egregious errors and duplications on his Schedule C. This revision eliminated the costs of goods sold item because admittedly there was no inventory involved, eliminated the duplication of the contract labor figure that was originally deducted both as part of cost of goods sold and as a separate item on Schedule C, and eliminated the union dues that were originally deducted on both Schedule A and Schedule C of petitioner's return as filed. ↩
6. Sec. 280A(c)(5)(A) limits deductions allowable under sec. 280A(c) to the amount of gross income derived from the use of the home office during the taxable year.↩
7. The storage fee of $ 1,177.81 claimed on brief as part of petitioner's revised Schedule C expenses represented payments made to one Marie Heilman, allegedly for storing his computer from July through October of 1986 after his move to Rockville, Maryland, and before he purchased a house, plus certain telephone expenses. We note that the checks are marked as "rent", and at least $ 290 of the first payment was identified as a returnable security deposit.↩
8. These factors are: (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.↩
9. See the following cases: Maximoff v. Commissioner, T.C. Memo. 1987-155 (taxpayer made sustained and continuous effort during year to develop his product, working 20 to 30 hours a week on this activity in addition to full-time job; abandonment of project indicated taxpayer was interested in money-making activities, not just recreational hobby or activity designed to generate tax losses); Crouch v. Commissioner, T.C. Memo. 1990-309; Hopcus v. Commissioner, T.C. Memo. 1988-181 (taxpayer's horse-boarding activity was a trade or business; taxpayer advertised for boarders, kept contemporaneous journal entries, had a separate bank account, and generally conducted the operation in a businesslike manner). See also Antonides v. Commissioner, 893 F.2d 656 (4th Cir. 1990), affg. 91 T.C. 686↩ (1988). 10. See Bert v. Commissioner, T.C. Memo. 1989-503; Shaller v. Commissioner, T.C. Memo. 1984-584, affd. without published opinion 813 F.2d 403 (4th Cir. 1986); Perrote v. Commissioner, T.C. Memo. 1982-624, Hawkins v. Commissioner, T.C. Memo. 1979-101, affd. without published opinion 652 F.2d 62↩ (9th Cir. 1981).
11. Petitioner testified that he did intend to make a profit and that this letter was merely intended to try to bargain with JPRS for more work and more money. Petitioner contends that he knew he would lose money the first 2 years while he assembled his home office and computer system, but that after these initial costs, he would begin to make a profit. As will be discussed in this section, we do not find that the facts of this case nor petitioner's actions correspond with his self-serving testimony that profit was his primary objective for engaging in this activity.↩
12. It should be noted that this Court realizes that a bona fide trade or business will not be turned into a hobby merely because its owner enjoys his work and derives pleasure from it; "suffering is not a prerequisite to deductibility." Hawkins v. Commissioner, supra, 38 T.C.M. 469, 471 (1979), 48 P-H Memo. T.C. par. 79,101 at 441; see also Jackson v. Commissioner, 59 T.C. 312, 317↩ (1972).
13. Petitioner has claimed laundry and cleaning expenses and has presented many canceled checks representing payments for carpeting, paint, and furniture, as well as rent and utilities for his home office. These are nondeductible expenditures as petitioner now acknowledges on brief. See supra↩ note 6. 14. Petitioner's inadequate record keeping will be more fully discussed in the "Employee Business Expenses" section below.↩
15. The parties agree that the stipulation contains a typographical error. It states that respondent allowed $ 1,347 in direct moving expenses. Respondent actually allowed $ 1,387.25 in direct expenses. ↩
16. Petitioner concedes on brief that he miscategorized certain indirect moving expenses, subject to the $ 3,000 limit, as direct moving expenses. ↩
17. Petitioner has determined the $ 197.39 amount as follows: (1) $ 1,453.56 charged by Allied Van Lines for the transportation of household items, packing labor, elevator charges, and an extra pickup charge; (2) $ 14.04 for gasoline expenses for travel by car from King of Prussia, Pennsylvania, to the Washington, D.C., area; (3) $ 3.80 for road toll charges; and (4) $ 113.24 in additional direct expenses. These amounts total $ 1,584.64. By subtracting respondent's allowance of $ 1,387.25, one arrives at the $ 197.39 figure. However, as will be discussed, this figure includes some double counting of expenses and will not be allowed in its entirety.↩
18. The term "loan" is used for convenience and is not intended to indicate that any money transferred by petitioner represents a bona fide indebtedness. ↩
19. Shortly after arriving in the United States and obtaining her green card, Ms. McCaffrey divorced petitioner. The divorce decree was entered on Oct. 21, 1985. Petitioner reported this situation to the United States Immigration and Naturalization Service as a fraudulent relationship.↩
20. See also Mellen v. Commissioner, T.C. Memo. 1968-94↩. 21. See Rodgers v. Commissioner, T.C. Memo. 1985-220↩, in which a nonbusiness bad debt deduction was allowed to a taxpayer for advances made to her ex-husband with the expectation of repayment on a definite date. These advances were documented by signed promissory notes and notations of "loan" on the checks used to make the advances.
22. The $ 100 disallowed represented four checks made out to specific individuals, rather than to qualifying charitable organizations. ↩
23. This donation was not claimed on petitioner's 1986 Schedule A. During audit, petitioner claimed an additional deduction for a donation he made to the Philadelphia Fire Victims donation drive in May or June 1986. Petitioner determined the $ 755 figure from memory, 2 years after these donations occurred. Respondent conceded that a donation was actually made and allowed $ 320 of the claimed deduction.↩
24. See Kern v. Commissioner, T.C. Memo. 1988-171↩ n.15.
25. There have been a number of cases in which this Court has had to independently determine the value of donated items. For example, see Abercrombie v. Commissioner, T.C. Memo. 1984-659; Kern v. Commissioner, T.C. Memo. 1988-171; Rhode v. Commissioner, T.C. Memo. 1990-656, affd. without published opinion sub nom. Abrahams v. Commissioner, 961 F.2d 207↩ (3d Cir. 1992).
26. Moreover, in his petition, petitioner claimed an additional $ 6,348 theft loss of a sterling silver set not claimed on his original return.↩
27. Respondent disputes this intention by asserting that petitioner had always planned to depart on June 13. Respondent points out that, on May 25, 1986, petitioner paid his rent for June 1 through June 13. Petitioner wrote a letter to his church elders, dated June 1, 1986, indicating that he would be moving on June 13 and would be starting his new job on Monday, June 16. Thus, respondent suggests that petitioner never intended to move on June 9 and, consequently, had no reason to pack his car on June 8. In view of petitioner's lack of credibility as a witness, we agree with respondent's assertion.↩
28. This Court has stated the standard for weighing the evidence to determine whether a theft has occurred in Elliott v. Commissioner, 40 T.C. 304, 311 (1963) (quoting from Allen v. Commissioner, 16 T.C. 163, 166 (1951)), as follows: Petitioner has the burden of proof. This includes presentation of proof which, absent positive proof, reasonably leads us to conclude that the article was stolen. If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail. If the evidence is in equipoise preponderating neither to the one nor the other conclusion, petitioner has not carried * * * [his] burden.↩
29. We agree with respondent's assessment that, if the theft occurred as petitioner claims, petitioner's actions were not rational nor were the purported actions of the thief. At trial, petitioner's counsel suggested to the investigating officer, Richard Hiller, that the thief or his accomplices may have unloaded petitioner's personal property from the car prior to driving the car out of the apartment complex. Officer Hiller's initial testimony, however, indicates that this scenario is highly unlikely, given the number and location of police patrols that evening in the parking lots of petitioner's apartment complex as well as the timing of the theft and capture of the perpetrator. The perpetrator's accomplices were also arrested later that day and had no stolen property in their possession. In addition, this Court agrees with respondent that "it pushes the limits of credibility" that the thieves would unload heavy boxes of technical books, a television set and VCR, diplomas, tools, a vacuum cleaner, and the like, carry them off into the woods, and not be observed. If a thief is going to steal a car, it would make no sense to unload its contents before stealing it.↩
30. See also Khinda v. Commissioner, T.C. Memo. 1984-432↩.
31. Petitioner contends he is entitled to a depreciation deduction of his original basis in the car equal to 37 percent of 95 percent of the purchase price ($ 12,938.70), or $ 4,547.95. In addition, petitioner contends that he incurred $ 1,385.52 in repairs and other direct expenses for the car. Therefore, he claims a deduction for 95 percent of that amount, or $ 1,316.24. ↩
32. In connection with his job search, petitioner contends he traveled to Alabama and Massachusetts, and also visited various university libraries. In connection with both his job search and his translation services, petitioner states he made numerous trips to the University of Pennsylvania library and the Library of Congress. Petitioner also asserts he traveled to meet with a JPRS representative to seek additional translation work.↩
33. Although petitioner testified from this calendar during the trial and refers to it as an exhibit on brief, the 1986 calendar was marked for identification only and was not offered or received into evidence at trial. Moreover, that document has no probative value at all. ↩
34. Sec. 1.274-5(c)(1), Income Tax Regs., provides as follows: A record of the elements of an expenditure made at or near the time of the expenditure, supported by sufficient documentary evidence, has a high degree of credibility not present with respect to a statement prepared subsequent thereto when generally there is a lack of accurate recall. Thus, the corroborative evidence required to support a statement not made at or near the time of the expenditure must have a high degree of probative value to elevate such statement and evidence to the level of credibility reflected by a record made at or near the time of the expenditure supported by sufficient documentary evidence. * * * ↩
35. However, petitioner has not adequately substantiated the expenses and business purpose of other claimed job-hunting trips. For example, on brief, respondent points out that petitioner's documentary evidence shows that he traveled to Greenfield, Massachusetts, a town in the western part of the State, yet petitioner claimed he was interviewing in Boston, which is in the eastern part of the State. Since petitioner has made no effort to explain this discrepancy, we have not sustained this or other such unsubstantiated deductions.↩
36. It is practically impossible to determine from the record what claimed expenses were actually incurred and the purpose for which they were incurred. For example, petitioner testified that, each Friday and Saturday, he would spend $ 6 on long distance telephone calls and on photocopying while at the Library of Congress. Petitioner states that he always kept coins with him for such calls and photocopying. However, petitioner also testified that he made not only job-hunting calls in this manner, but also many calls regarding lawsuits filed against him by his tenants in Arizona and Idaho and calls to various friends around the country. Petitioner professes to have a 300-page telephone log detailing the nature of all of the telephone calls made during this time, but he has not presented to this Court any real evidence as to the exact amount spent on job-search telephone calls.↩